UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X
UNITED STATES OF AMERICA          :
                                  :
      -against-                   :    No. 00 Cr. 15 (JFK)
                                  :    **Opinion and Order**
ABDEL GHANI MESKINI,              :
                                  :
            Defendant.            :
-----------------------------X
APPEARANCES:

> For the Government:
>       Preet Bharara
>       U.S. Attorney for the Southern District of New York
>             Of Counsel:  Christopher L. LaVigne
>                          Michael M. Rosensaft

> For Defendant:
>       Mark S. DeMarco

**JOHN F. KEENAN, United States District Judge:**

On October 13, 14, and 19, 2010, I held supervised release revocation hearing as to nine violations of supervised release Abdel Ghani Meskini ("Meskini" or "Releasee") allegedly committed from in or about 2006 until November 10, 2009 in Atlanta, Georgia.  This Opinion and Order sets forth my findings of fact and conclusions of law with respect to each of the nine specifications.

## I.   Background

On March 7, 2001, Meskini pleaded guilty pursuant to a cooperation agreement to an eight count Information charging: (1) conspiracy to provide material support to terrorists; (2) conspiracy to commit identification document fraud; (3)

1

transferring and attempting to transfer false identification documents; (4) transferring and using means of identification of other persons; (5) trafficking in unauthorized access devices; (6) effecting and attempting to effect transactions with unauthorized access devices; (7) bank fraud; and (8) possessing a firearm as an illegal alien in the United States.  On January 23, 2004, I sentenced Meskini principally to seventy-two months in prison, to be followed by five years of supervised release. Meskini's supervised release was subject to several mandatory and standard conditions, including that he not commit another federal, state, or local crime; not possess a firearm; cooperate with the Government; submit truthful and complete monthly reports to his probation officer; avoid places where controlled substances are illegally sold, used, distributed, or administered; and not associate with criminals.  I additionally ordered that Meskini pay $59,545.80 in restitution and an $800 special assessment.

On March 17, 2010, the United States Probation Department submitted a report outlining nine violations of supervised release; an amended report was submitted on August 5, 2010.  The Government alleges that Meskini:  (1) failed to pay court-ordered restitution; (2) attempted to possess a firearm in or about the spring or summer of 2007; (3) attempted to purchase an AK-47 assault rifle in or about the summer and fall of 2009; (4)

committed criminal attempt in violation of Ga. Code Ann. § 16-4-1; (5) committed criminal solicitation in violation of Ga. Code Ann. § 16-4-7; (6) associated with a person who had a felony record and/or engaged in criminal activity from 2006 to November 10, 2009; (7) frequented an establishment where illegal drugs are sold, used, distributed, or administered on multiple occasions; (8) made false statements in late 2009 in violation of 18 U.S.C. § 1001; and (9) failed to cooperate with the Government.

## II.  Findings of Fact

The Government's burden of proof in a supervised release revocation hearing is a preponderance of the evidence.  18 U.S.C. § 3583(e)(3).  The Government's evidence at the revocation hearing established the following facts.

After his release from prison, Meskini relocated to Atlanta, Georgia and obtained a job managing low-end apartment complexes known as "21 Delmont" and "32 Peachtree Avenue." (Oct. 13, 2010 Tr. at 75).  Meskini's responsibilities included collecting rent from tenants and making repairs in the apartments.  (Id. at 66, 75).  By all accounts, 21 Delmont in particular was a hotbed of criminal activity, where narcotics sales and prostitution occurred openly and persistently.  (Id. at 15-16, 65; Oct. 14, 2010 Tr. at 197-99, 258-59).

3

Incredibly, the United States Probation Department approved Meskini's employment as building manager of the complexes. (Oct. 19, 2010 Tr. at 347).  In fact, Meskini met with various members of law enforcement throughout his tenure at 21 Delmont and 32 Peachtree Avenue, all of whom knew or should have known that the job would bring Meskini in constant contact with criminals.  Although Probation claims that it was unaware of the extensive criminal activity occurring on the premises, the parties stipulated that it is the common practice of the Probation Office in the Northern District of Georgia to visit a releasee's place of employment.  (Id.).  Had an officer checked out 21 Delmont in person, the illicit activity would have been readily apparent.  Moreover, Meskini met with Detective Jay Sausmer of the Fulton County Police Department numerous times between 2005 and 2009 and told the detective that criminal activity, including prostitution, occurred in the properties he managed.  (Id. at 300-02).  However, neither Detective Sausmer nor any other law enforcement official ever told Meskini not to work at 21 Delmont or 32 Peachtree Avenue.  (Id.).  Even after he was no longer employed at 21 Delmont, in 2009 Meskini told Special Agent James Pinette of the FBI that he had interacted with prostitutes and drug dealers in his capacity as building manager.  (Oct. 13, 2010 Tr. at 15-16).

While working at 21 Delmont, Meskini came to know several of the tenants, including Crystal Roughton and Ricky Stephenson, two of the Government's witnesses who testified pursuant to immunity orders.  Ms. Roughton is a prostitute who admittedly uses crack cocaine on a daily basis; however, she stated that she had refrained from smoking crack for the four or five days prior to taking the witness stand and that her mind was clear. (Id. at 61-63).  Ms. Roughton testified that she lived at 21 Delmont for a few months in 2005, and moved back in mid-2006, staying for a little more than a year.  (Id. at 64).  She saw Meskini at 21 Delmont every day, (Id. at 66), and, as corroborated by the log of calls made and received by Meskini's phone number from September to November 2009, (Gov't Ex. 18A; Oct. 19, 2010 Tr. at 354), the two spoke very frequently.  On a few occasions, they had sex.  (Oct. 13, 2010 Tr. at 72). Meskini helped Ms. Roughton with her prostitution business by loaning her money, proof-reading her escort service advertisements, assisting her with obtaining internet access, and teaching her how to screen clients.  (Id. at 67-69).  If Ms. Roughton was unable to pay her rent, Meskini would give her an extension.  (Id. at 73).  She identified Meskini in the courtroom.  (Id. at 66).  Overall, it appears that Ms. Roughton and Meskini had a close relationship.

Ms. Roughton testified about Meskini's involvement with firearms on two specific occasions.  First, she explained that she had seen Meskini with a gun in 2007.  (Id. at 76).  Although she could not recall the exact month of this observation, she remembered that the weather was warm.  (Id.).  She explained that she and Meskini were talking in the parking lot of 21 Delmont when another tenant named Chris interrupted them.  (Id. at 77-79).  She saw Chris go to a green car, open the trunk, retrieve a black handgun, and give the gun to Meskini.  (Id. at 77-79, 162).  She then watched as Meskini put the gun under the driver's seat of his black pickup truck and drove off.  (Id. at 80).  Ms. Roughton observed this transaction from a distance of about ten feet.  (Id. at 79).  Approximately one day later, Ms. Roughton confronted Meskini on the phone about the events that took place in the parking lot, and Meskini confirmed that the item she saw was a gun.  (Id. at 81).

Additionally, Ms. Roughton testified that in the fall of 2009, Meskini asked her to help him obtain an AK-47 assault rifle.  Specifically, Ms. Roughton recounted that Meskini told her he needed an AK-47 and would not spend more than $5,500 to purchase one.  (Id. at 85-86, 162).  Shortly thereafter, Meskini informed Ms. Roughton that he had found an AK-47 for sale but that it came with 50 grenades he did not want.  (Id. at 87).  The next time they spoke, Meskini told Ms. Roughton that he had

6

emailed her pictures of an AK-47 as an example of what he was interesting in buying. (Id. at 87-88, 91-92). Ms. Roughton told Meskini that she had not received any emails from him. (Id.).[1] Meskini explained that the name of the sender would be Cofield, and then he verified her email address. (Id. at 91-92). On September 20, 2009, Ms. Roughton did receive an email from "Tony Cofield" attaching three photos of an AK-47. (Gov't Ex. 20; Oct. 13. 2010 Tr. at 92-94). After she received the email, Ms. Roughton made numerous phone calls to try to locate an AK-47 for Meskini. (Oct. 13, 2010 Tr. at 95). In October of 2009, Ms. Roughton informed Meskini she might have a lead on an AK-47 for him, but Meskini told her that he had already gotten one. (Id.).

It is not immediately apparent from the email addresses that Meskini sent either or both of the messages attaching the pictures of the AK-47. Meskini disclosed to the Probation Department that he had an email address beginning with "ghani68." (Gov't Ex. 21, Monthly Supervision Reports for

---

[1] In support of this testimony, the Government introduced an email dated September 17, 2009 from "katal_09" to an email address closely resembling Ms. Roughton's – her name was spelled "Crystel" instead of "Crystal" and an underscore was omitted. (Gov't Ex. 5). The September 17th email attached the same three photos of an AK-47 as did the email Ms. Roughton eventually received. (Gov't Exs. 5, 20). The September 17th email was returned to the sender as undeliverable. (Gov't Ex. 6).

September and October 2008; Gov't Ex. 1A).  However, the
Government established that the "Tony Cofield" account and the
"katal_09" account were registered to the same IP address.
(Gov't Exs. 2A, 3A).  An FBI agent who logged onto a wireless
network in the vicinity of Meskini's home was able to send an
email from the IP address used to register the "Tony Cofield"
and "katal_09" accounts.  (Gov't Ex. 19S).  Furthermore, the
Government introduced access records for the "ghani68," "Tony
Cofield," and "katal_09" accounts demonstrating that, on several
occasions in October of 2009, someone logged onto these accounts
in quick succession, all using the IP address located in the
vicinity of Meskini's home.  (Gov't Exs. 1B, 2B, 3B; Oct. 19,
2010 Tr. at 362-63).  I find that a preponderance of the
physical evidence and testimony establishes that Meskini used
the "katal_09" and "Tony Cofield" accounts to email Ms. Roughton
pictures of an AK-47.

    As evidenced by her profession and drug addiction, Ms.
Roughton certainly has a complicated personal history involving
numerous contacts with the criminal justice system.  I am well
aware that she refused to testify absent the immunity order.
However, she spoke in a forceful and forthright manner.  She was
unwilling to implicate Meskini in any drug activity despite the
prosecutor's invitation.  (Oct. 13, 2010 Tr. at 72-73).  With
respect to the handgun, her recollection was limited and

specific; she testified that she only saw Meskini with a handgun on one occasion, and she was able to describe the gun with some particularity.  Her testimony regarding the AK-47 was corroborated by emails recovered from accounts used by Meskini. I cannot discern any real motivation she might have to fabricate a story about a man she purportedly holds in high regard.  (Id. at 156, 164-65).  Therefore, I credit Ms. Roughton's testimony as a reliable account of Meskini's possession of a handgun in 2007 and attempt to purchase an AK-47 in the fall of 2009.

The Government also called to the stand Ricky Stephenson. Mr. Stephenson moved to 21 Delmont in late 2006 or early 2007, and he came to know Meskini well.  (Oct. 14, 2010 Tr. at 196-97).  He identified Meskini in the courtroom.  (Id. at 197). Although he had a felony record at the time he moved to 21 Delmont, Mr. Stephenson did not recall ever telling Meskini about his criminal history.  (Id. at 213).  He testified that Meskini did not sell drugs.  (Id. at 200-01).  Nevertheless, the two soon became involved in various fraudulent activities.  Mr. Stephenson admitted that he made fake identification documents for Meskini and his wife, (Id. at 209-11), as well as fake checks.  (Id. at 216).  The two also engaged in a scheme whereby Meskini obtained five or six real credit cards from tenants' mail, Mr. Stephenson made fake IDs to match the name on the credit card, and then a third person used the credit card and ID

to purchase plasma screen televisions and other merchandise. (Id. at 211-12, 214).  Mr. Stephenson also testified that Meskini let him use mailboxes at the properties he managed so Mr. Stephenson could set up fraudulent corporations with real addresses and receive checks and other mail for those companies. (Id. at 227-29).

Mr. Stephenson testified that he knows Ms. Roughton from 21 Delmont, but that they have not spoken or seen each other in over a year.  (Id. at 229-30).   Like Ms. Roughton, Mr. Stephenson testified that he saw Meskini with a gun.  (Id. at 218).  In early 2007, Meskini was in the driver's seat of his black pickup truck with the window rolled down, and Mr. Stephenson was standing outside the vehicle's door.  (Id. at 218-20).  He saw a black automatic handgun on the floor of the truck, and he watched as Meskini bent over to pick up the gun, sat up, switched the gun from one hand to the other, and then placed the gun under the seat of the truck.  (Id. at 220-22). Ms. Roughton and Mr. Stephenson's descriptions of the time period when Meskini possessed a gun, the color and type of gun, and the truck he was driving when he possessed the gun are substantially the same.

Mr. Stephenson's credibility is not without problems.  In 2009, Mr. Stephenson pleaded guilty to 168 counts of bank fraud; he was sentenced to 74 months in prison and is currently

incarcerated.  (Id. at 189-91).  In proffer sessions with the
Government, he additionally admitted to selling large quantities
of narcotics, illegal gun possession, and extensive involvement
in postal money order and check fraud.  (Id. at 192-95).  He
entered into a cooperation agreement and testified for the
Government with the goal of receiving a Rule 35(b) motion and
potentially a reduced sentence.  As both sides pointed out, Mr.
Stephenson's numerous frauds are not reflective of an overly
truthful character, and the incentive of a Rule 35 motion gives
him some motive to lie.  However, Mr. Stephenson was able to
give a specific description of the gun; he did not overreach,
testifying that he only saw Meskini with a gun one time.  Ms.
Roughton corroborated his testimony in most respects.  Taking
these factors into account, I find that his testimony,
particularly involving Meskini's gun possession, was candid.

As mentioned earlier, numerous law enforcement officers
interviewed Meskini during the time he lived in Atlanta.
Special Agent Pinette testified that he met with Meskini four
times in the fall of 2009, and at no point did Meskini
acknowledge any involvement in illegal activity or attempt to
purchase an AK-47.  (Oct. 13, 2010 Tr. at 12, 15-21).
Similarly, Detective Sausmer testified that Meskini continually
denied participating in any kind of illegal activity.  (Oct. 14,
2010 Tr. at 302-03, 307-09, 311-13).  However, in a "stunning"

turn of events, in an October 24, 2009 interview, Meskini informed Detective Sausmer that a tenant had offered to sell him an AK-47.  (<u>Id.</u> at 312-13).  Aside from this admission, Meskini denied his involvement in any activity that would constitute a violation of supervised release.

### III.   Conclusions of Law

#### A.   Specification 1: Restitution

Meskini has paid $31,450 of restitution, with a remaining balance of $28,095.80.  (Gov't Ex. 22).  He was taken into custody by the Department of Homeland Security on November 10, 2009.  It appears that he made regular restitution payments until that time, and any failure to pay restitution is due to the fact that he is currently incarcerated.  Therefore, I find Meskini NOT GUILTY of Specification 1.

#### B.   Specification 2: 2007 Firearm Possession

As discussed above, Ms. Roughton and Mr. Stephenson's testimony establishes that Meskini possessed a handgun in 2007 in contradiction of a mandatory condition of supervised release. I find that Meskini is GUILTY of Specification 2, which is a Grade C Violation.

#### C.   Specifications 3, 4 and 5: 2009 Attempted AK-47 Purchase

Meskini was required as a condition of his supervised release not to commit another federal, state, or local crime. Georgia state law prohibits the possession of "any sawed-off

shotgun, sawed-off rifle, machine gun, dangerous weapon, or silencer."  Ga. Code Ann. § 16-11-123.  A machine gun is defined as "any weapon which shoots or is designed to shoot, automatically, more than six shots, without manual reloading, by a single function of the trigger."  Id. § 16-11-121. Furthermore, under Georgia state law a person commits the offense of criminal attempt when "with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime."  Id. § 16-4-1.

I am well aware, and it is generally known, that an AK-47 is a machine gun as defined by the Georgia statute.  However, the Government has not made a request pursuant to Rule 201(d) of the Federal Rules of Evidence that I take judicial notice of this fact.  If the Government wishes, it may re-open the hearing and make the appropriate request, and I will give defense counsel an "opportunity to be heard" under Fed. R. Evid. 201(e) "as to the propriety of" my taking such notice.

Additionally, a person commits the offense of criminal solicitation when "with intent that another person engage in conduct constituting a felony, he solicits, requests, commands, importunes, or otherwise attempts to cause the other person to engage in such conduct."  Ga. Code Ann. § 16-4-7.  The email exhibits and Ms. Roughton's testimony establish that Meskini

asked Ms. Roughton, among others, to find an AK-47 for him to purchase, and in so doing, took a substantial step towards the possession of an illegal machine gun. Therefore, I find that Meskini is GUILTY of Specifications 3, 4, and 5,[2] which are Grade A violations.

### D. Specification 6: Association with Felons

As the prosecutor acknowledged during his summation, there is no evidence that either Ms. Roughton or Mr. Stephenson told Meskini that they had previously been convicted of felonies; in fact, it is not clear whether Ms. Roughton has a felony record at all. (Oct. 19, 2010 Tr. at 351). Both witnesses testified that they were involved in criminal activity while living at 21 Delmont, and both developed close relationships with Meskini. However, Meskini met Ms. Roughton, Mr. Stephenson, and various other prostitutes and drug dealers in the course of his employment, and his interactions with these people were closely tied to a job the Probation Department approved. Moreover, Meskini told two law enforcement officers about the rampant criminal activity occurring at 21 Delmont; that alone should have been a warning signal to Probation, the Fulton County Police, or the FBI to investigate further, and yet no officer

---

[2] It appears that Specification 3 (attempted unlawful possession of a firearm) and Specification 4 (criminal attempt), both referencing Meskini's search for an AK-47 in the fall of 2009, are functionally the same.

visited his place of employment or told him to find another job.
The Government's attempt to put Meskini in jail for associations
about which it knew or should have known for several years is
disingenuous at best.  I find that Meskini is NOT GUILTY of
Specification 6.

### E.    Specification 7: Frequenting Drug Establishments

Both Ms. Roughton and Mr. Stephenson confirmed that Meskini
wanted nothing to do with drugs – he did not use or sell.  It is
true that many of the apartments at 21 Delmont were occupied by
drug dealers and/or users.  However, there is no evidence that
Meskini went to these apartments for a nefarious purpose;
instead, he was required to enter the premises to collect rent
and make repairs.  Having approved a job that necessarily
involved the frequenting of establishments where illegal drugs
were used or sold, the Probation Department cannot now maintain
that Meskini violated the conditions of his supervised release
by performing work-related tasks.  Therefore, I find that
Meskini is NOT GUILTY of Specification 7.

### F.    Specification 8: False Statements

In light of my finding that Meskini attempted to purchase
an AK-47 in or about September 2009, his statements to Special
Agent Pinette in the fall of 2009 that he was not involved in
any criminal activity were demonstrably false.  Moreover, the
monthly Probation Report asked whether the releasee had been

questioned by any law enforcement officers, and each month,
including October 2009 when Special Agent Pinette interviewed
him repeatedly, Meskini checked "No."  The monthly Probation
Report also asked whether the releasee possessed or had access
to a firearm, and Meskini failed to report his attempt to
purchase an AK-47.  I find that Meskini is GUILTY of
Specification 8, which is a Grade B Violation.

### G.   Specification 9: Failure to Cooperate

The conduct underlying Meskini's alleged failure to
cooperate with the Government has already been addressed in
Specifications 2, 3, 4, 5 and 8.  This Specification is nebulous
to say the least and sets forth no independent basis for
revocation.  Therefore, I find that Meskini is NOT GUILTY of
Specification 9.

**SO ORDERED.**

**Dated:**    **New York, New York**
        **October 27, 2010**

John F. Keenan
**John F. Keenan**
**United States District Judge**